Case number 21-36-16 Sunless Inc v. Palm Beach Tan Inc, et al. Oral argument not to exceed 15 minutes per side. Mr. Prager, you may proceed for the appellant. Thank you. Good morning. May it please the court, my name is Eric Prager. I represent plaintiff appellant Sunless in this case. I've reserved five minutes for rebuttal. You're welcome. Sunless is one of the leading suppliers of spray tanning booths, solutions, and services in the country. This appeal is about those spray tanning services. Sunless owns the federally registered trademark Mystic Tan for spray tanning services, registered in 2009 and now incontestable. Sunless uses a number of mechanisms to ensure that get the services they expect. Trademark lawyers call these mechanisms quality control measures, and Sunless uses six of them that are detailed on pages 26 to 27 of its opening brief and throughout the first Cooper declaration. Mr. Prager, I hate to interrupt you, but I think your case really turns on what the product is. And I think that kind of turns on how this industry operates. So I have never gotten a spray tan. My guess is my colleagues have not either. I could be wrong. So it's pretty serious. You're stereotyping us, but go ahead. Only as a judge. I just, in any event, maybe. So if I were to walk in to a spray tanning salon, here's what I want to know. What happens when I go in? Okay. And I do get my nails done. So I go in to my nail salon, and there are these various brands of nail polish, DND, and they're all sorted by brand. And I pick my color and my brand off the shelf and brand matters. And then the technician applies it. And then they bake it onto your nails under some heat lamp, which is also branded, but nobody really cares about the lamp. They care about the polish. And nobody thinks those two things go together. They're different products. How does it work when I walk into a tanning salon? Do I go to the wall and I'm like, here's the mystic tan solution. Here's a different brand. I choose my color and my brand. And then I put me in this kind of booth or that kind of booth, or is it all one thing? Do I go in and I say, I want mystic tan, and then they just hand me light, medium, or dark? It's a great question, Your Honor. So certainly it's going to vary from salon to salon, but a very large part of how the business operates and how Palm Beach Tan operates is that like with your nail polish, there's a high degree of brand loyalty to the booth solutions and services that are available at salons. In fact, throughout our papers, we've cited the lengths to which Palm Beach Tan has gone to promote in its own advertising that it makes available mystic tan spray tanning services. And there's brand loyalty among consumers who will seek out locations that have the mystic tan services that they're looking for. So what happens? The consumer goes into the salon and different salons have different amounts of touch from the personnel who are there, but ultimately the consumer will make his or her way to a tanning booth that is branded with, in very large print, mystic tan on the booth. There is a touch screen on the exterior of the booth that's branded with mystic tan. There are voice prompts that say you're about to start your mystic tan and walk you through the process. So it's clear. Well, go ahead, John. So I understand that, but my point is like I walk in and let's say they have two different brands. They have mystic tan and they have, I'm going to make up a brand like super tan. Booths. I walk in and I say to the person in the front desk, I want a mystic tan. Am I choosing I want a booth and solution? Is that what a customer would expect? Or would I go to the wall and pick, I want mystic tan solution and I want you to put it in the super tan booth. That's two products. Your claim is it's one product. My claim is that the services registration is infringed. The, the, the services are delivered by using mystic tan solution in a mystic tan booth. And even if the touch screen no longer says mystic tan, and even if the voice prompts are changed, the door says you're getting, this is a mystic tan. And the consumer who paid there to get a mystic tan thinks they're getting a mystic tan, but they aren't because. Sunless is no longer able to stand behind the services because it doesn't know what solution is going into it. So, well, judge Lars, I don't want. No, go ahead. So obviously the customer knows that the booth is a mystic tan booth because the booth has the display screen and et cetera. The booth itself is obviously branded the district court here. However, in its opinion says that Palm beach has a sticker on each booth, which says they're not using mystic tan solutions. There's a placard on the desk. When you walk in, that says the same thing. And apparently even on the cartridge, which my understanding is the customer puts into this receptacle thing on the booth, the cartridge set, you know, is branded as a. They call it premium or whatever it is, not mystic tan. So, you know, I don't see any basis to dispute any of those, um, uh, findings by the district court here. So if those things are true, who's going to be confused about whether the solution being used for the tan is a mystic tan solution. Your honor respectfully, those weren't findings of the district court, the district court recited Palm beach position, but didn't find that the, that the disclaimers were effective or seen by consumers. Okay. But the court obviously for purposes of this preliminary determination, uh, preliminary injunction, the court is, is assuming, or, finding for purposes, you know, making a tentative finding that these things are there, you guys didn't dispute that the placards are there and so on. And, um, uh, and so, you know, I mean, I think we can assume that, you know, these are like consumers with ordinary common sense. Uh, I I'm struggling to see particularly with an abuse of discretion, standard of review, how anybody's going to be confused by the syringe. Um, your honor, this court has said in the Audi case that where identical marks are used, a trial court should be especially leery of disclaimers and courts within this circuit has said that the burden is on the party, advancing the disclaimer to establish that was effective. Okay. But I think, you know, maybe this just turns on whether the district court was correct in its implicit assumption that a customer of ordinary intelligence will be able to distinguish between the booth and the, uh, tanning solution that is inserted into the booth. The customer will be able to, to understand that those are two different things. And given the placards and, uh, you know, like three or four different kinds of notifications to the customer that, that in, in Palm beaches facilities, these are provided by two different companies. And if you don't like the greasiness of the solution, well, that's, you know, they're whatever it is, premium thing. It's not you guys. Uh, I mean, it just doesn't seem like this is a big challenge for somebody to sort out. Your honor, we, the consumers who were unhappy about this complaint to sunless that consumers understand that sunless controls the process, that the spray tan that they wanted, the service that they wanted was unsatisfactory. And when the service was unsatisfactory, this was before the supposed reformulation. And meanwhile, you guys don't have any backup of these complaints. And it, you know, when you file a preliminary injunction motion, presumably you're going to put forward what you have, particularly when the other side points out, you guys don't have any backup to, to tell us anything really about these complaints. So, you know, the district court didn't put a lot of weight on those. Uh, we have testimony from the CEO who referred to the company's, uh, consumer, uh, data, the, the, uh, uh, customer service database complaints that were received. So there, there isn't a report that the software generates that, that indicates what, what those complaints were. She looked it up. That, that was, that was in the real world. When were those complaints though? Were they before? I understand they were before the reformulation of the product. I don't think that matters at all. Whether Palm beach is selling good lotion or bad lotion. I don't think that matters. I get your point there. Was it before the disclaimer and was it before they stopped marketing? We sell mystic tans because I think they're still marketing the beds. They're still saying we have mystic tan or booths. We still, we have mystic tan booths. So the, the, um, the cessation of marketing using mystic tan happened in December or January of 2021. And the, the, the PI papers were put together in March. So these instances were not between January and March of 2021. These instances were in 2020 and the, the three instances that are of record were in the first half of 2020. It turns out there were many additional instances that just weren't into the record yet. But if, if we get to a certain end or continue to trial that that will be, they're not there. I mean, they didn't happen as far as the record is concerned here though. Okay. Any other, uh, judge Gilman, any questions before we hear from Ms. Meyerhoff? Yes. Meyerhoff. I guess we fine. Okay. Can I ask one more? Sure. Of course you can. Because you didn't have one. Is that right? Judge Gilman? Right. I didn't know. I'm not interrupting. That doesn't mean you would get an extra, but go ahead. I'm just kidding. All right, go ahead. So if, let me ask this question. If Palm beach painted over or put a sticker over the mystic tan logo on your booths, is your claim now, is your case now over? Because if I'm a consumer walking into a Palm beach salon now, I would say, I would like to get a tan please. And they would send me to your sun kiss booth or whatever. But if it doesn't say mystic tan right now, the only clue I would have is those big doors that say mystic tan, which is a pretty big clue, right? I assume I'm standing there for five minutes. I mean, I can't have my phone in there and nothing to do except look at this logo. So that seems like a clue, but on the other hand, if they paint over that, is this case over? Cause that's otherwise, how could I be confused? The going forward part of the case is over if they, if they remove the branding. Okay. And have they removed the branding? Uh, as of the record in this case, we know they have not, it's still on the doors in the record in this case. Okay. Okay. All right. Thank you, sir. You'll have your rebuttal. Ms. Meyerhoff. Good morning, your honors. I'm here on behalf of the Apple East. I can answer that question, even though it's not in the record. Um, all of the booths, the mystic tan booths, the doors in throughout the United States have no reference to mystic tan at all. Uh, that has been removed and announced as sunscapes, uh, as part of the premier collection of, of Palm beach tan. I mean, this might be a better question for your opponent, but he wants an injunction, which is forward looking relief. So like, is there anything left to enjoy from your, and then we can ask him on rebuttal. No, your honor, there's nothing left to enjoy. And, and to, to your initial question about what happens when you walk into a Palm beach tan store, uh, when someone walks in, they say, I want to do a sunless tan. They have a choice of a UV bed, you know, the typical tanning like that, or the spray tan at that point, they select what their solution is. And so when they go into a Palm beach tan store, they buy a premier collection spray tan solution. And on that bottle, it says premier collection. It's got the disclaimer right there. They buy it there. They walk back to the booth. Um, they put that solution into the, the container themselves. Uh, the audio doesn't say anything about mystic tan. Uh, and, uh, they step into the booth, uh, they, the audio and the visual doesn't say anything about mystic tan and they step into the booth, they get sprayed and get their lovely tan, and then they walk away. Uh, so up to now they're walking into a booth that doesn't even say mystic tan. I mean, no logo. And then does it say like, welcome to your Palm beach tan or something like that? Um, it says you're going to have your premier collection, uh, tan collection tan. Right. So, so, and it has all the, the, the placards, um, at the front desk and on the booth and everything else. So up until, uh, uh, recently the only reference to mystic tan was on the doors and Palm beach changed that out in every store throughout. And so we don't believe that there is a possibility or reasonable possibility that anybody would believe they were getting a mystic tan. Uh, there, it doesn't say mystic tan on the signage outside or anywhere else. So we believe that there was no abuse of discretion by judge Oliver and that, uh, all of the factual findings that he made were correct. There wasn't any clear error in his factual findings. Uh, when he was balancing the, the, um, likelihood of, of confusion, uh, factors, um, and the preliminary injunction factors, there was no abuse of, of discretion and, uh, whether he applied the Frisch factors correctly and the evidence in the record was not there. And that's the problem for some lists, uh, in this case. Uh, let me ask you this, miss Meyerhoff. Uh, yes, sir. Do you agree? I gather that the district court was required under six circuit precedent to apply the Frisch factors, right. And deciding whether there was consumer confusion. Yes. And those eight factors are appropriate and Frisch, your honor gives plenty of flexibility for a district court to choose which factors are most important. And the sixth circuit does not require that the courts in this circuit to apply, um, El Greco. And so there's plenty of flexibility. Let's, let's say I agree with that as far as Frisch versus El Greco, but it does, we, this court has an opinion, a case that says the court talking about the district must at least attempt quote, a thorough and analytical treatment of the Frisch factors. And what concerns me is whether judge Oliver did that. I'm looking at page nine of his opinion. And he says, he says the parties pay little attention to the Frisch factors and their briefs. Indeed, Sunless does not mention them at all. And Palm Beach addresses them only cursorily in a footnote. And he says the parties oversight ignores the sixth circuit directive. The court shall conduct quote, a thorough and analytical, uh, treatment of the Frisch factors. And then it undermines the court's ability to complete the task. And then he says, accordingly, the court finds that Sunless has not established a likelihood of consumer confusion under the Frisch factors. Well, he skips any analysis of any of the eight factors. I mean, he announces the right test. He lists in the paragraph above that on page nine, what those eight factors are, but I don't see in his opinion, any discussion. Do you, can you point me to where, in his opinion, he actually goes through the eight Frisch factors? He does not go through the eight Frisch factors. I agree with you, Your Honor. I think he faulted, he faulted, um, Sunless because they were required, it was their burden to do that analysis and they did not. All right, but wait, wait, he could have cured that though, simply by demanding supplemental parties. You can't, if, if, if we, if this court imposes on the district court a requirement that they thoroughly analyze this consumer confusion issue through the discussion of the Frisch factors, the district court can't avoid that by saying, well, the parties didn't brief me on it, so, hey, I don't have to consider it. The appellant, I mean, the, the plaintiff has the burden of proof, didn't meet the burden of proof, bango. No, that doesn't work that way. So, you know, it seems to me we've got a case that says that if the court fails to do that, the remedy is to remand for an analysis of the Frisch factors. Well, I think, I think in also the, the preliminary injunction in balancing those four factors, um, it allows the court to look at the other factors and Judge Oliver also said they didn't, Sunless did not, um, address the Frisch factors, but then the court went on to look at the other merits of a preliminary injunction and expressed his concerns on page 10 about Sunless failing to, um, address the court's evidence that Sunless presented about the quality control issue. So, I don't think he, I don't think that he rested 100% on, on, uh, the Frisch factors. Okay. Um, Ms. Meyerhoff, before we go to other parts of the four-part test, is there a, a burden allocation, uh, under the, the relevant case law as to the, uh, uh, confusion aspect of this claim? Does somebody have the burden of showing confusion in this case? Yes, Your Honor, I believe that absolutely there, Sunless has the burden to show a likelihood of confusion and... All right. So, in, in, so Sunless has a burden for purposes of the preliminary injunction motion, among other things, is that accurate? Yes, Your Honor, it is. Of showing confusion, which in our circuit means you have to show it under Frisch, and, okay, well, it was their burden. Yes, Your Honor. All right. Uh, what about this 4S thing? I mean, I, I think you, you kind of made a point in your brief that this is basically a, a vertical integration scheme. Uh, do you want to explain that a little bit? I would be happy to, Your Honor. The, we first learned of the 4S program after we said we were going another direction with our own solution, and so then they popped up and said, well, we've got a deal for you. And all of a sudden, uh, we were the first ones to be offered by Sunless, this, this program. We're not aware, we've asked in discovery, but we're not aware of them offering it to anybody else and anybody else taking them up on it. And so they said, you're going to have to have us, um, you're going to have to submit your proprietary solution to a third party. We're going to have them test it, and then you're going to pay us every single time. So you'll pay us for our booth that you buy from us. You will pay for your solution, and then you'll pay us every time you lose, use the solution. And so we are, our concern with that is this is, this is literally an antitrust, trust problem. And, and that's why our counterclaim says you're, you're trying to either make us buy your solution, or you're going to make us pay, uh, to not buy your solution. And, uh, and they want it in perpetuity. And so I believe our CEO talked with Sunless, the CEO to say, well, would it stop after a certain period of time? They said, no, you would pay us forever. And so, uh, that quality is, it's in the guise of quality control, but we don't believe it's really quality control. But we can't, we can't assess that claim now, right? In order to make a tying claim, you know, we have to know about the strength of the market and the strength of the, I mean, what the market, we don't have any bet before us. Right. And we're happy to move forward on our, on our antitrust claim, you know, counterclaim. And there's a breach of contract claim going on in state court as well, right? So there's a contract attached to the complaint that says you won't use this Mystic Tan. You won't use other solutions in the machine, right? But that's all being happening in state court. I understand you don't think you signed that contract. They said you understood there's going to be a battle of reforms. That's all going to take place in state court. Yeah. No, there's actually no contract and there's nothing going on in state court. They just attached that as an example. They haven't, they haven't brought a breach of contract claim against you in state court. No. My interest was in the public interest part of the four-part test. And does the record tell us how much Sunless wanted to charge you per bottle or per cartridge of this stuff, if you did this 4S plan with them? I don't know that it, that it does. I don't think that they told us exactly it was, or if they did, I'm sorry, I don't remember. What I do know is that as of January of, right after they, they filed the lawsuit, what they told us is there was going to be a 59% increase in the charge to us for any solution. And there was a approximately 100% increase in the booth. So what we were looking at was just massive increases in, just only to Palm Beach. Okay. Do I understand that you, that Palm Beach just outright purchases the booths? Is that right? Yes, your honor. We buy lots of them and they are our booths to do with as we choose. We do not lease them or rent them or anything like that. And was there ever any contract between Sunless and Palm Beach that requires you when you buy the booths to use the, the Sunless solution? No. Although I understand that going forward now, as a result of this lawsuit, they're, they're trying to write purchase orders that would require that. But, but no, there are no, no requirements whatsoever for how you can use the booths that you purchase. Okay. Well, I must say the chief problem I'm having is the district court just didn't analyze, go through the eight Frisch factors as this court says that it was supposed to do. So do you have any good answer to that? Well, your honor, my answer is it, it's a balancing of all of those preliminary injunction factors and the court is not required to define a yes on each one. It balances the four and the court did look at that quality control issue. Oh, wait, wait, wait, wait. Now, now, wait, now don't confuse the, you're talking about the first factor likelihood of success, the next one irreparable harm. But I'm just talking about the first thing, the likelihood of consumer confusion. That's what Frisch deals with. And Frisch says there on the merits. And I don't see in the opinion of judge Solomon, any analysis going through any of those factors. He just says, accordingly, the court finds that Sunless has not established the likelihood of consumer confusion under the Frisch factors. Well, I think your honor, on the evidence of the record, it was Sunless's burden. And he said that Sunless didn't, didn't have the burden based on the evidence. So he has to put it in context of going through Frisch factors to say why Sunless didn't do that. And I don't think there's anything to look at there other than his summary conclusion. I mean, the district court does say on page 10, setting aside Sunless's failure to address the Frisch factors, the court is not convinced that it's concerns regarding quality control, merit of preliminary injunction. And then the I don't know, you know, I guess that starts with his discussion about why El Garco is not the governing state. Well, I mean, that's not all he talks about. But anyway, you and I can talk about this offline. Meyerhoff, are most of the Frisch factors even relevant in this case? Because most of the Frisch factors go to your traditional kind of trademark case where you have two different marks. And so like, if your brand had an M, and we would look at like you, like maybe you were like magic tan, and then we'd look at your M's and we'd see if they were similar or not similar, would you be confused? Aren't most of the Frisch factors irrelevant in this case? And haven't we said that the ultimate question is whether relevant consumers are likely to believe that the product or service offered by the parties are affiliated in some way. And so that's, I mean, if we had applied the Frisch factors, we would have skipped most of them anyway, right? Well, I think yes, I think you made the right conclusion that there's no likelihood of confusion. I think on the one hand, what Sunless is arguing is that this is effectively a counterfeiting case. And so you can disregard the Frisch factors, because they're basically the same marks and the same goods. I think on the other hand, here, you can say you can disregard most of them, but I would say it's because we are using a completely different mark, which is Palm Beach Tan using the Premier Collection mark, and they're using Mystic Tan. So depending on how you kind of look at it, yes, they're different marks and it's solution versus a booth. And so yes, at some level, the Frisch factors don't matter. The whole issue, but as it is in any trademark infringement case, is likelihood of confusion by relevant consumers about the party's goods and services. And here, we think he got it right in saying they go into a booth, but they're not going to think that that booth and those solutions are necessarily tied together, given common sense by consumers and all of the efforts that Palm Beach made to make sure to distinguish between what Palm Beach offers versus Mystic. So one more question. Why didn't you tell us that you've changed the booths? Because I'm kind of wondering whether this case is moot. If I were you, I might've said it's moot, but you didn't say it's moot. Because if there's no at all in your stores, he wants forward-looking relief. So if you've changed the booths... Well, Your Honor, this happened literally as of the end of December 2021. And my understanding is since that's outside of the record, I couldn't really tell you something outside of the record other than right now here in this oral argument. So if we should have told you that before, I certainly apologize, but it's literally recent. And that's just part of Palm Beach's efforts. It wants to be its own brand, and that's been all part of this. If there's nothing that we could enjoin, if there's no conduct of yours that we could enjoin, then we don't have jurisdiction. But it seems to me that if you wanted us to think that, you would have told us that. Well, I needed to know for sure at the end of December from the client that they in fact had made nationwide change. And I got that confirmed. And yes, there is nothing. So what would happen is, yeah, there's nothing left to enjoin. But we don't have anything in the record here. Nothing. No, we don't. No. I mean, we don't have any evidence. Yeah. No, we'd be taking your word for it. It just seems odd to me that- I mean, it would be something when it goes back to the district court to tell Judge Oliver about. Anyway, I don't know. We can file a motion to dismiss the appeal, if you would like, procedurally. Too late for that. No, I'm just kidding. All right. Well, anyway, any additional questions from either of the other judges? All right. Thank you, Ms. Meyerhoff, for your arguments. Mr. Prager, you have your rebuttal. Thank you. We covered a lot of territory, so I'll try to move quickly through it. First, this circuit has authorized the evaluation of likelihood of confusion by tests other than fresh. The court permitted the use of the Rogers test in the LaFace records case. So there is precedent from this court itself authorizing other tests. Now, it's your burden to prove likelihood of confusion for purposes of the relief you seek. Is that correct? Yes. Okay. And there is, contrary to the district court opinion, there's abundant evidence in the record of going to, by my count, seven of the eight Frisch factors, if you refer to the first Copperman declaration. Why isn't this argument just utterly waived when you didn't argue about the Frisch factors in the district court? We, I mean, you can talk about those things, you know, as just things other, you know, just things we should think about. But as far as the Frisch factors qua such, you just, I mean, that's, you just didn't make that argument. We didn't, and we thought that it was quite clear that this was an unauthorized goods case and that the proper mode of evaluation was the El Greco mode because of the reasons that Judge Larson pointed out that virtually none of the Frisch factors are relevant in a counterfeiting case, which, which this is very closely analogous to. Right, but in order for this to be a counterfeiting case, I think the, I mean, you didn't argue this, but like, I'm not sure you presented this to the district court. Maybe you did and you can tell me, but it seems to me that to make it a counterfeiting case, you would have to say for 20 years, since we started marketing Mystic Tan, the only way to operate this booth is with our solution. Here to for every consumer, whoever got a Mystic Tan would have thought of this as a whole. Here's the booth with the giant label. Here's the solution, which I put in. That mark is so strong that merely handing somebody a little five-inch bottle that has basically no logo on it, just says medium, light, or dark is insufficient to overcome that. They still have the Mystic Tan on the door, so when I walk in and I go for my Mystic Tan, this little tiny brown bottle that just says medium and says Palm Beach really tiny, it's insufficient to overcome that one. I don't know that you made that case to the district court. You needed to tell the district court this is one product, not two. Therefore, it's a counterfeit product. How did you make that claim? We argued extensively throughout both our opening brief and our reply brief below that consumers over a period of 20 years of harmonized use of Mystic Tan booths and solutions and service that they associate with us and that when they don't get it, they complain to us. That was the argument. The proof before the district court is my machine only works with this solution, but not any evidence that customers have come to believe that these are the same. My booth only works with this solution and three customers complained. That's what you presented to the district court. I respectfully, Your Honor, there's quite a bit more to it than that. We presented the evidence of 50 million tans over a period of 20 years. There was extensive evidence of how familiar people are with Mystic Tan as a brand for sun tanning services. Where is that? I mean, I read all the declarations. Sure. The Copperman Declaration, the first Copperman Declaration, goes through the strength of the mark, the acquired familiarity with the mark at the time. The CEO of Copperman gives evidence with respect to all of the factors that go into Frisch, focusing most heavily on the strength of the mark in those paragraphs that I identified to you. The briefs, as you'll see, also talk extensively about that. If I may, there are a couple of final points that I think could use some clarification. With respect to the contract issue that was discussed, there is a contract with the franchisees and that contract is Exhibit J to the complaint. Palm Beach Tan corporate refused to sign that contract and had its own purchase orders, but all of the franchisees did sign that contract. I learned from Council that apparently a new brand has been put on Mystic Tan booths, Sunscape, I believe Council said. That sounds like reverse passing off. You can remove a brand from someone else's product. That's a different claim you can bring. Sir, you can just wrap up your sentence there, but I think you're out of time unless there are other questions. The one sentence, Your Honor, that I have is that if a preliminary injunction does not enter into this case, this would be the first time in any appellate court that we could find, in any district court, that a party circumvented a barcode used to protect quality control and there were no consequences of doing that. Thank you, Mr. Prager, for your argument as well. We thank you both for working with us on changing our plans from an in-person argument to a remote argument today. The case will be submitted.